



FILED

May 07 2026, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Taylor Routh,

*Appellant-Plaintiff*

v.

Bernard Kappe, Joseph K. Bernard, State of Indiana, Indiana Department of Transportation, Delaware County, Indiana, and City of Muncie, Indiana,

*Appellees-Defendants*

May 7, 2026

Court of Appeals Case No.
25A-PL-2593

Appeal from the Delaware Circuit Court

The Honorable John M. Feick, Judge

Trial Court Cause No.
18C04-2307-PL-82

**Opinion by Judge Bradford**

Judges Pyle and Kenworthy concur.

**Bradford, Judge.**

# Case Summary

After having been involved in a motor vehicle collision with Joseph Bernard, Taylor Routh initiated a lawsuit against Bernard; Bernard Kappe; the State of Indiana; the Indiana Department of Transportation ("INDOT"); Delaware County, Indiana; and the City of Muncie.[1] The State of Indiana and INDOT (collectively, the "State Parties") moved for summary judgment on May 30, 2025, arguing that they were immune from liability. The trial court granted the State Parties' motion and dismissed them from the litigation. Routh contends on appeal that the trial court erred in doing so. Because we disagree, we affirm.

# Facts and Procedural History

## I.   Overview of Relevant INDOT Rules & Procedures

By statute, INDOT must follow the Indiana Manual on Uniform Traffic Control Devices ("the Manual") when determining whether to install or remove a traffic signal at a specific intersection. *See* Ind. Code § 9-21-4-1. Pursuant to the Manual, "[a]n engineering study of traffic conditions, pedestrian characteristics, and physical characteristics of the location shall be performed to

---

[1] Kappe, Delaware County, and the City of Muncie were subsequently dismissed from the litigation.

determine whether installation of a traffic control signal is justified at a particular location." Appellant's App. Vol. II p. 40. The Manual contains a list of nine factors ("warrants") that INDOT must consider in making its decision whether to install a traffic signal at an intersection. Appellant's App. Vol. II p. 40. Specifically, the Manual indicates that

> [t]he investigation of the need for a traffic control signal shall include an analysis of factors related to the existing operation and safety at the study location and the potential to improve these conditions, and the applicable factors contained in the following traffic signal warrants:
>> Warrant 1, Eight-Hour Vehicular Volume
>> Warrant 2, Four-Hour Vehicular Volume
>> Warrant 3, Peak Hour
>> Warrant 4, Pedestrian Volume
>> Warrant 5, School Crossing
>> Warrant 6, Coordinated Signal System
>> Warrant 7, Crash Experience
>> Warrant 8, Roadway Network
>> Warrant 9, Intersection Near a Grade Crossing[.]

Appellant's App. Vol. II p. 40. "The satisfaction of a traffic signal warrant or warrants shall not in itself require the installation of a traffic control signal." Appellant's App. Vol. II p. 40. A traffic control signal should not be installed unless "one or more of the [warrants] described in [the Manual] are met" and "unless an engineering study indicates that installing a traffic control signal will improve the overall safety and/or operation of the intersection." Appellant's App. Vol. II p. 40 (emphases omitted).

## II.    INDOT Actions Involving the Intersection

[3]    The motor vehicle collision that gave rise to the instant action occurred at the intersection of State Road 32 (also known as Jackson Avenue) and Ohio Avenue ("the Intersection"), in Muncie, Indiana.  Prior to 2017, there had been a traffic signal at the Intersection.

[4]    In 2017, INDOT performed a traffic count and signal warrant analysis (the "2017 Study") to determine whether the Intersection met any of the nine warrants to justify maintaining the traffic signal as outlined within the Manual. The 2017 Study "was performed after Muncie Superintendent of Public Works Duke Campbell requested that the traffic signal be removed after traffic at the intersection had been reduced due to the closure of two nearby facilities." Appellant's App. Vol. II p. 35.  It was determined that the Intersection "did not meet any of the nine warrants described in the [Manual]."  Appellant's App. Vol. II p. 35.  "In order to justify maintaining a traffic signal at an intersection, at least one of those warrants must be met."  Appellant's App. Vol. II p. 35. Because the Intersection did not meet any of the nine warrants, on "January 30, 2018, INDOT removed the traffic signal at the intersection and replaced it with stop signs controlling approaches to State Road 32."  Appellant's App. Vol. II p. 35.

[5]    "After 2017, the intersection experienced a higher[-]than[-]expected frequency of severe right-angle crashes and INDOT initiated a project at the intersection to address those crashes (the '[P]roject')."  Appellant's App. Vol. II p. 35.  In 2021, Mark Muenz, a traffic-planning engineer for INDOT, "prepared an

Engineering Assessment Report to document the engineering assessment phase of project development." Appellant's App. Vol. II p. 35. "During the engineering assessment phase of the project, INDOT analyzed the [I]ntersection's crash history, design considerations, community/external stakeholder concerns, adjacent INDOT projects, financial issues and alternative proposals before identifying a compact urban roundabout as the preferred alternative." Appellant's App. Vol. II p. 35. "The compact urban roundabout proposed would cost an estimated $1,616,000.00." Appellant's App. Vol. II p. 35.

"In early 2022, the INDOT Traffic Safety Management Team deliberated and awarded funding on the project." Appellant's App. Vol. II p. 36. "On June 9, 2022, the project was approved and initially scheduled for construction in Fiscal Year 2027." Appellant's App. Vol. II p. 36. "On June 1, 2023, before the project was opened for bidding by designers, INDOT relinquished the intersection and nearby portions of State Road 32 to the City of Muncie." Appellant's App. Vol. II p. 36.

### III. The Motor-Vehicle Collision and Instant Litigation

On June 4, 2022, Routh approached the Intersection eastbound on State Road 32. At the same time, Bernard approached the Intersection northbound on Ohio Avenue. Bernard's vehicle collided with Routh's vehicle after Bernard had disregarded the posted stop sign at the Intersection and proceeded through the Intersection without stopping. Following the collision, Routh suffered

"serious and life-altering injuries" and was transported to IU Ball Memorial Hospital for immediate medical attention. Appellant's App. Vol. II p. 16.

[8] On July 17, 2023, Routh initiated the instant litigation claiming negligence with respect to the State Parties. Specifically, Routh asserted that prior to the collision, the State Parties had been "informed and/or aware of the hazardous nature of the [Intersection], but chose not to take any remedial measures such as installing a proper traffic light/signal to control the safety of the [Intersection]." Appellant's App. Vol. II pp. 17–18. Essentially, Routh asserted that the State Parties had negligently removed the traffic signal and had negligently failed to re-install a new traffic signal after they had become aware of the dangerous condition caused by the lack of a traffic signal.

[9] On May 30, 2025, the State Parties moved for summary judgment, arguing that they had discretionary-function immunity under Indiana Code section 34-13-3-3(a)(7) and law-enforcement immunity under Indiana Code section 34-13-3-3(a)(8). Routh opposed the State Parties' request for summary judgment. Following a hearing on the State Parties' motion, on October 14, 2025, the trial court granted the State Parties' motion for summary judgment and "dismissed [the State Parties] from this matter, with prejudice." Appellant's App. Vol. II p. 14.

## Discussion and Decision

[10] Routh contends that the trial court erred in granting summary judgment in favor of the State Parties.

> When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. The moving party bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party.

*Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012) (internal citations and quotation omitted).

[11] After "a series of judicial decisions almost entirely abolished common law immunity for government entities and activities in this state[,]" the Indiana General Assembly passed the Indiana Tort Claims Act ("ITCA"), which "granted absolute immunity to governmental entities" under certain circumstances. *F.D. v. Ind. Dept. of Child Servs.*, 1 N.E.3d 131, 135–36 (Ind. 2013) (internal quotation omitted). "Pursuant to the ITCA, governmental entities can be subject to liability for tortious conduct unless the conduct is within an immunity granted by Section 3 of [the] ITCA." *Jurich v. Ind. Dep't of Transp.*, 126 N.E.3d 846, 855 (Ind. Ct. App. 2019) (internal quotation omitted, brackets in original), *trans. denied*. In listing the exempted acts, the ITCA provides that a governmental entity is entitled to immunity and is not liable if a

loss results from the performance of a discretionary function. *Id.*; *see also* Ind. Code § 34-13-3-3(7). "This type of immunity shields certain policy decisions which cannot be assessed by tort standards." *Lee by & through Estes v. Bartholomew Consol. Sch. Corp.*, 75 N.E.3d 518, 526 (Ind. Ct. App. 2017) (internal quotation omitted). "Whether immunity applies is a question of law for the court, and the party seeking immunity bears the burden of demonstrating that its conduct is within the protection afforded by the ITCA." *F.D.*, 1 N.E.3d at 136.

[12]    The Indiana Supreme Court has adopted the planning/operational test for determining what acts qualify for discretionary function immunity under the ITCA. *Peavler v. Bd. of Comm'rs of Monroe Cnty.*, 528 N.E.2d 40, 46 (Ind. 1988). The planning/operational test "is designed to insulate only those significant policy and political decisions which cannot be assessed by customary tort standards." *City of Beech Grove v. Beloat*, 50 N.E.3d 135, 138 (Ind. 2016) (internal quotation and brackets omitted). "This assessment requires close consideration of the nature of the governmental actions and the decision-making process that was involved." *Id.* "Labeling an action as planning or operational, without more, is insufficient to determine whether immunity exists." *Id.* "[T]he distinction between planning and operational functions is only a standard, not a precise rule." *Id.*

[13]    In applying the planning/operational test,

> [w]e have held that planning functions are discretionary and thus shielded by immunity, whereas operational functions are not.

> Planning functions involve the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices. On the other hand, operational functions involve the execution or implementation of already formulated policy.

*Lee*, 75 N.E.3d at 526 (internal citation and quotations omitted). "The ultimate consideration is whether the action is one that was intended to be immune, and the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question." *Beloat*, 50 N.E.3d at 138 (internal quotation omitted).

[14]     In deciding whether the function is the type intended to benefit from immunity, the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question. Factors which would, under most circumstances, point toward immunity, include:

> 1. The nature of the conduct—
>    a) Whether the conduct has a regulatory objective;
>    b) Whether the conduct involved the balancing of factors without reliance on a readily ascertainable rule or standard;
>    c) Whether the conduct requires a judgment based on policy decisions;
>    d) Whether the decision involved adopting general principles or only applying them;
>    e) Whether the conduct involved establishment of plans, specifications and schedule; and
>    f) Whether the decision involved assessing priorities, weighing of budgetary considerations or allocation of resources.

2. The effect on governmental operations—
   a) Whether the decision affects the feasibility or practicability of a government program; and
   b) Whether liability will affect the effective administration of the function in question.

3. The capacity of the court to evaluate the propriety of the government's action—
   Whether tort standards offer an insufficient evaluation of the plaintiff's claim.

Immunity assumes negligence but denies liability. Thus, the issues of duty, breach and causation are not before the court in deciding whether the government entity is immune.

*Peavler*, 528 N.E.2d at 46. In arguing immunity, the governmental agency has the burden to demonstrate the discretionary nature of the decision at issue. *Id.* at 48.

[15] In granting the State Parties' request for summary judgment, the trial court found our decision in *Lee v. State*, 682 N.E.2d 576 (Ind. Ct. App. 1997), *trans. denied*, to be dispositive. In *Lee*, INDOT had conducted a multi-year study into two projects: the replacement of a bridge and the replacement of a dangerous stretch of road. 682 N.E.2d at 578–79. INDOT ultimately decided to complete both replacements as one project and began the necessary planning and land acquisition to complete the project. *Id.* at 579. The traffic accident at issue in *Lee* occurred prior to final approval and completion of the project. *Id.* Lee filed a wrongful death action against INDOT on behalf of her daughter, who had died as a result of the accident. *Id.* at 577. INDOT moved for—and was

granted—summary judgment on the basis that it was immune from liability. *Id.* Lee argued on appeal that at the time of the accident, the project had moved beyond the planning phase and that it was therefore operational, meaning that INDOT was not immune from liability. *Id.* at 579. In affirming the trial court, we concluded that

> [a]fter reviewing the record, we think that the project at issue represents exactly the type of discretionary function that the legislature intended to protect. INDOT's decision to correct the Wirt Curves in conjunction with the replacement of Harbatus Bridge was the type of discretionary decision intended to be shielded from liability. We will therefore not second-guess INDOT's policy-oriented decision.

*Id.* We reach the same conclusion in this case.

[16] Here, INDOT had, following the Manual, decided to remove the traffic signal and replace it with a stop sign in 2017. It completed a second study pursuant to the Manual after determining that there had been more traffic accidents at the Intersection than had been anticipated. The Manual requires INDOT to consider all possible alternatives to correcting an issue, which INDOT apparently did when it decided that a roundabout was more appropriate for the Intersection than a traffic signal. Similar to the circumstances in *Lee*, at the time of Routh's traffic collision, INDOT was in the process of completing plans for the Project, which will replace the stop sign with a roundabout. The planning phase was ongoing at the time of Routh's traffic collision as the Project would

not receive final approval until five days after Routh's traffic collision and was not scheduled to be completed until the 2027 fiscal year.

[17] We agree with the State Parties that the designated evidence demonstrates that INDOT was "in the middle of conducting a very thorough deliberation on the solution to the increase in crashes when Routh's vehicle was struck by Bernard's[.]" Appellees' Br. p. 17. Applying our reasoning from *Lee*, we reach the same conclusion, *i.e.*, that the decision to replace the stop sign with a roundabout was the type of discretionary decision intended to be shielded from liability. *See id.*; *see also Jurich*, 126 N.E.3d at 858–59 (concluding that INDOT had engaged in a discretionary function when it decided, after completing a study of traffic conditions and volume, not to install a temporary traffic signal and was therefore immune from liability under the ITCA); *Joseph v. LaPorte Cnty.*, 651 N.E.2d 1180, 1184–85 (Ind. Ct. App. 1995) (providing that the County had acted in its discretion in determining the speed limit on the road in question and that the designation of the speed limit was a discretionary policy decision as a matter of law), *trans. denied*.

[18] The judgment of the trial court is affirmed.

Pyle, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Austin P. Sparks
Jason R. Delk
Delk McNally LLP
Muncie, Indiana

ATTORNEYS FOR APPELLEES
STATE OF INDIANA AND INDIANA
DEPARTMENT OF TRANSPORTATION

Theodore E. Rokita
Indiana Attorney General

Samuel J. Dayton
Supervising Deputy Attorney General
Indianapolis, Indiana